UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANNA JEAN SALISBURY,

    Plaintiff,

v.                                                   Case No. 1:18-cv-980
                                                   Hon. Paul L. Maloney

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant,
_____/

**REPORT AND RECOMMENDATION**

*Pro se* plaintiff Deanna Jean Salisbury brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration (Commissioner) which found that she no longer qualified for disability insurance benefits (DIB). In a determination dated November 7, 2008, plaintiff was found disabled as of August 31, 2008. PageID.32. Upon a periodic review of plaintiff's entitlement to disability benefits, the Commissioner determined that she was no longer disabled as of October 1, 2013.[1] PageID.32. An administrative law judge (ALJ) reviewed plaintiff's claim *de novo* and entered a written decision affirming this determination on March 20, 2018. PageID.32-41. This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

---

[1] 20 C.F.R. § 404.1594(a) provides that, "There is a statutory requirement that, if you are entitled to disability benefits, your continued entitlement to such benefits must be reviewed periodically."

1

## I. LEGAL STANDARD

This Court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. § 405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Services*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence de novo, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §404.1505; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

The Commissioner employs an eight-step sequential evaluation for a continuing disability review which differs from the five step sequential evaluation used to determine if a claimant is disabled in the first instance. 20 C.F.R. § 404.1594(f). *See, e.g.*, *Harris v. Commissioner of Social Security*, No. 1:14-cv-985, 2016 WL 1165396 at *2 (W.D. Mich. March 25, 2016) (applying eight-step evaluation to an SSI claim).

The ALJ summarized the eight-step sequential evaluation as follows:

At step one, I must determine if the claimant is engaging in substantial gainful activity. If the claimant is performing substantial gainful activity and any applicable trial work period has been completed, the claimant is no longer disabled (20 CFR 404.1594(f)(l)).

At step two, I must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). If the claimant does, her disability continues (20 CFR 404.1594(f)(2)).

At step three, I must determine whether medical improvement has occurred (20 CFR 404.1594(f)(3)). Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 404.1594(b)(1)). If medical improvement has occurred, the analysis proceeds to the fourth step. If not, the analysis proceeds to the fifth step.

At step four, I must determine whether medical improvement is related to the ability to work (20 CFR 404.1594(f)(4)). Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 404.1594(b)(3)). If it does, the analysis proceeds to the sixth step.

At step five, I must determine if an exception to medical improvement applies (20 CFR 404.1594(f)(5)). There are two groups of exceptions (20 CFR 404.1594(d) and (e)). If one of the first group exceptions applies, the analysis proceeds to the next step. If one of the second group exceptions applies, the claimant's disability ends. If none apply, the claimant's disability continues.

At step six, I must determine whether all the claimant's current impairments in combination are severe (20 CFR 404.1594(f)(6)). If all current impairments in

3

combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step.

At step seven, I must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform past relevant work (20 CFR 404.1594(f)(7)). If the claimant has the capacity to perform past relevant work, her disability has ended. If not, the analysis proceeds to the last step.

At the last step, I must determine whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience (20 CFR 404.1594(f)(8)). If the claimant can perform other work, she is no longer disabled. If the claimant cannot perform other work, her disability continues. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience.

PageID.33-34.

## II.     ALJ's DECISION

The determination dated November 7, 2008, is the most recent favorable decision which determined that plaintiff was disabled. PageID.34. This determination is known as the "comparison point decision" (CPD). *Id.* At the time of the CPD, plaintiff "had a medically determinable affective disorder and migraines" and "was found unable to function prudently to perform past relevant work or other work." *Id.*

At step one[2], the ALJ found that plaintiff has not engaged in substantial gainful activity through the date of the decision. *Id.* At step two, the ALJ found:

> 4.     The medical evidence establishes that, since October 1, 2013, the claimant has had the following medically determinable impairments: depression, migraines, and more recently, residuals from a December 1, 2016 motor vehicle accident, including degenerative disc disease. These are the claimant's current impairments.
>
> 5.     Since October 1, 2013, the claimant has not had an impairment or combination of impairments meeting or medically equaling the severity of an

---

[2] While the ALJ applied the eight-step sequential evaluation, he did not set forth separate paragraphs or sections addressing each step. Rather, he presented a narrative which eventually addressed the substance of each step.

4

> impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

PageID.34.

At step three, the ALJ found that plaintiff's medical improvement occurred as of October 1, 2013. PageID.35. At steps four, five and six, the ALJ concluded as follows:

> 7. Since October 1, 2013, the impairments present at the time of the CPD decreased in medical severity to the point where the claimant had the residual functional capacity to perform simple, repetitive tasks, without hourly quotas, but she could do end of day quotas and have occasional contact with supervisors, co-workers, and general public.
>
> 8. The claimant's medical improvement is related to the ability to work, because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(C)(3)(ii)).
>
> 9. Since October 1, 2013, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 404.1594(1)(6)).

PageID.36.

At step seven, the ALJ found:

> 10. Based on the impairments present since October 1, 2013, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to performing simple, repetitive tasks, without hourly quotas, but she could do end of day quotas and have occasional contact with supervisors, co-workers, and general public.

PageID.36. The ALJ also found that plaintiff "has no past relevant work." PageID.40.

Finally, at step eight, ALJ determined that since October 1, 2013, plaintiff could perform a significant number of unskilled jobs at the light exertional level in the national economy. PageID.40-41. Specifically, the ALJ found that plaintiff could perform the requirements of light and unskilled occupations in the national economy such as mail clerk (98,200 jobs), laundry sorter (20,800 jobs), and routine clerk (53,400 jobs). PageID.41. Accordingly, the ALJ determined that

plaintiff's disability ended on October 1, 2013, that the plaintiff has not become disabled again since that date. PageID.41.

### III. DISCUSSION

*Pro se* plaintiff's brief does not include a Statement of Errors as required by the Notice (ECF No. 17) and Administrative Order No. 16-MS-018. The gist of plaintiff's claim is that she is still disabled due to the bi-polar disorder and migraine headaches.

#### A. Background

Plaintiff's DIB claim has a lengthy history. Plaintiff was found disabled as of August 31, 2008. PageID.32, 109-110. In the explanation of determination from September 26, 2013, Larry Irey, Ph.D. noted that as of August 2008, plaintiff had a bi-polar disorder and depression, which combined with "social/familial conflicts" resulted in an involuntary hospitalization on April 2, 2008 and a discharge on April 11, 2008. PageID.110. Dr. Irey noted that "[u]nder the circumstances, would consider the clmt would not be able to function prudently, unless she had gone back to work during the interim period." *Id.* However, after reviewing plaintiff's recent medical records, Dr. Irey stated on September 26, 2013, that plaintiff "Appears to be capable." *Id.*

The agency sent plaintiff a Notice of Disability Cessation on October 23, 2013, informing her that based upon medical records from August 2013 (from the Riverwood Center, Lakeland Medical Practices, and Memorial Hospital – South Bend), advising plaintiff that "[y]our health has improved and you are able to work starting in 10/2013" and that "[y]our condition is no longer severe enough to be considered disabling under Social Security Rules." PageID.115-117. Plaintiff requested reconsideration. PageID.119. Plaintiff attended a hearing before a disability hearing officer in March 2015 (PageID.121-126), who issued a decision affirming that plaintiff

6

was no longer disabled (PageID.136-138). Plaintiff requested a hearing before an ALJ, which was held on April 6, 2017. PageID.49-85. Plaintiff was advised of her right to representation at the administrative hearing and chose to proceed without a representative. PageID.52-53, 187. At the conclusion of the hearing, the ALJ asked plaintiff to provide him with necessary information to obtain her missing medical records. PageID.75-76, 81.

The ALJ held a second hearing on February 27, 2018, and heard testimony from plaintiff, her husband, a medical expert (ME), and a vocational expert (VE). PageID.86-106. As discussed, on March 20, 2018, the ALJ found that plaintiff was no longer disabled under the meaning of the Act as of October 1, 2013, and had not become disabled again at any time since that date. PageID.29-41. The ALJ's decision to terminate plaintiff's benefits appears to be based upon examinations performed in 2013:

> [A]s early as April 26, 2013, the claimant has had generally normal mental status evaluations suggesting the ability to perform unskilled low stress limited people contact type work. As of October 1, 2013, she usually exhibited full range of affect, also characterized as broad affect (10F/3 and 4; 13F/2 and 3; 14F/5; 17F/5, 7, and 9; 20F/35; and 23F/3 and 10).

PageID.37. The ALJ noted that plaintiff had "rough patches" starting in February 2017 due to marital discord leading to inpatient hospitalizations for suicidal ideation in March and May 2017. PageID.37. This resolved by August 2017 when plaintiff and her husband reconciled. *Id.*

The ALJ's decision addressed plaintiff's medical treatment history, which appears to consist largely of medical marijuana and over the counter drugs:

> Although the claimant testified to continued disability, citing depression, headaches, and pain from the car accident, the level of treatment received since October 2013 remains consistent with the findings reached in this decision.
>
> For long periods, the claimant did not seek out formal mental treatment matching the findings reached in this decision. On February 28, 2018, she testified she had not seen a psychiatrist for at least six months, and she had no current therapist. This is consistent with her telling Dr. Davis on August 15, 2017 she did

7

not want psychiatric treatment so Dr. Davis suspended treatment (23F/3). This supports her symptoms were not that problematic. In fact, on August 15, 2017, the claimant told Dr. Davis medical marijuana kept her mood fairly even without taking regular prescription medication; indeed, she had a normal mental status evaluation (23F/3). On February 27, 2018, the claimant testified she only took medical marijuana on a regular basis for mental health. She said she had another medication she could take for anxiety, but she acknowledged she did not take it often (Hearing testimony).

As to headaches, the claimant does not take prescription medication for headaches nor does she seek specialist assistance for head pain, consistent with this determination ("F" Exhibits). The claimant earlier indicated she only occasionally takes over the counter Excedrin for pain, usually just needing "greens" homeopathically, also harmonious with the findings I make in this decision (3B/3).

The claimant has neck and low back pain from the December 2016 car accident. She receives injections, but she can walk normally, supporting a restriction to light type work activities (25F; 27F/3).

PageID.38.

The ALJ relied heavily on the ME's opinion given at the second hearing:

I give great weight to Dr. Mark Oberlander's medical expert opinion rendered at the second hearing. Dr. Oberlander had the opportunity to listen to the claimant's testimony, listen to Michael Salisbury's testimony, and review all of the medical evidence of record. Dr. Oberlander gave detailed and thoughtful testimony about the claimant's conditions. Dr. Oberlander assessed the claimant has a moderate limitation in all functional areas except a mild limitation in understanding, remembering, or applying information. I find a moderate limitation in that area remains more appropriate, given her need to make lists and make phone reminders. Dr. Oberlander assessed the claimant limited to simple, routine, and repetitive work tasks. He stated she required a low stress work environment without hourly production rate pace, but she could meet end of day work expectations. I agree. Dr. Oberlander testified the claimant could have only occasional contact with others in the workplace, excluding detailed or complex work activities. This is consistent with the findings I reach in this decision, and Dr. Oberlander's testimony remains consistent with the evidence overall.

PageID.40. The ALJ's residual functional capacity (RFC) determination acknowledged that plaintiff still had significant limitations similar to those identified by Dr. Oberlander. PageID.36. The vocational expert (VE) testified that a person with these limitations could perform a significant number of jobs in the national economy.

### B. Plaintiff's Arguments

### 1. Bi-polar disorder and migraine headaches

Plaintiff contends that the ALJ determined that her bi-polar disorder and migraine headaches were "cured or healed" because she was on holistic medication and medical marijuana. PageID.1013. Plaintiff is incorrect. Plaintiff was involuntarily hospitalized for ten days in April 2008 due to an ongoing problematic relationship with her mother, when she overdosed on prescription medication. PageID.35. Hospital staff diagnosed major depression and crack cocaine abuse. *Id*.

The ALJ noted that plaintiff had little history of treatment for mental impairments since that date, with the exception of a voluntary hospitalization about nine years later in 2017:

> For long periods, the claimant did not seek out formal mental treatment matching the findings reached in this decision. On February 28, 2018, she testified she had not seen a psychiatrist for at least six months, and she had no current therapist. This is consistent with her telling Dr. Davis on August 15, 2017 she did not want psychiatric treatment so Dr. Davis suspended treatment (23F/3). This supports her symptoms were not that problematic. In fact, on August 15, 2017, the claimant told Dr. Davis medical marijuana kept her mood fairly even without taking regular prescription medication; indeed, she had a normal mental status evaluation (23F/3). On February 27, 2018, the claimant testified she only took medical marijuana on a regular basis for mental health. She said she had another medication she could take for anxiety, but she acknowledged she did not take it often (Hearing testimony).

PageID.38.

The ALJ based plaintiff's medical improvement as of October 1, 2013, on a variety of factors. Contrary to plaintiff's contention, the ALJ never found that plaintiff's mental impairments were "cured" or "healed." Rather, the ALJ found that as of October 2013 plaintiff's treating psychiatrist found: plaintiff's global assessment of functioning ("GAF") scores increased showing clear improvement; that plaintiff's clinical findings of depression had improved; and that plaintiff had a remission in symptoms of substance abuse. PageID.36. The ALJ noted the fact that

plaintiff had not used crack cocaine since 2008 "suggests improvement." PageID.36. Finally, plaintiff's treating psychiatrist found on October 10, 2013, that plaintiff had only mild symptoms of depression and was functioning "pretty well." PageID.36. For all of these reasons, the ALJ found that plaintiff's condition had improved to the point where she could perform simple work involving repetitive tasks. *See* RFC (PageID.36).

Similarly, the ALJ did not state that plaintiff's migraine headaches were "cured" or healed." PageID.1013. Rather, the ALJ found that plaintiff did not present evidence that she suffered from disabling headaches:

> In addition to depression, the claimant has a long history of migraine headaches, yet these do not cause restrictions beyond the limitation delineated in this decision. Back in 2007, while working, she had migraines three to four times a week for which she took Topamax medication (2F/4). Now, she does not take any headache medication on a regular basis. She does not receive specialist treatment for a neurologist for head pain. Primary care diagnoses chronic migraines, noting ongoing sinusitis (22F/5 and 43). . . .
>
> As to headaches, the claimant does not take prescription medication for headaches nor does she seek specialist assistance for head pain, consistent with this determination ("F" Exhibits). The claimant earlier indicated she only occasionally takes over the counter Excedrin for pain, usually just needing "greens" homeopathically, also harmonious with the findings I make in this decision (3B/3).

PageID.37-38. Accordingly, plaintiff's claim of error should be denied.

### 2. Testimony by the ME and VE

Plaintiff contends that the ME and VE ("the 2 government employees who do the medical and job services") testified that she could not work. PageID.1013. Plaintiff is incorrect. As an initial matter, it is the ALJ – not an ME or a VE – who determines whether a claimant is able to work. The determination of disability is the prerogative of the Commissioner. *See Houston v. Secretary of Health and Human Services*, 736 F.2d 365, 367 (6th Cir. 1984). As discussed, the ALJ's RFC determination was consistent with the ME's testimony: that plaintiff be limited to

simple, routine, and repetitive work tasks; that plaintiff required a low stress work environment without hourly production rate pace, but she could meet end of day work expectations; that plaintiff could have only occasional contact with others in the workplace; and that plaintiff should not perform any more detailed or complex work activities than those identified. PageID.40, 102. As discussed in § III.B.5, *infra*, the VE testified that plaintiff could perform a significant number of jobs in the national economy. Accordingly, plaintiff's claim of error should be denied.

### 3. Testimony of plaintiff's husband

Plaintiff contends that the ALJ did not credit her husband's testimony. PageID.1013. Plaintiff is incorrect. The ALJ gave her husband's testimony some weight:

> Michael Salisbury testified. I give some weight to his testimony. Mr. Salisbury testified the claimant had significant pain to the point where his 70-year-old mother had to help her. He indicated the claimant did not receive regular treatment for the injuries from the car accident, as a doctor said she had a pre-existing condition. There is no evidence the claimant sought out free or low cost healthcare for residuals from the car accident. Michael Salisbury also described his wife as angry daily and needing space so people do not touch her, yet he was the one who burnt her wedding dress and destroyed a copy of their marriage certificate (27F/5). Mr. Salisbury testified treating sources at Riverwood threatened to institute institutionalize the claimant so she left them. However, Riverwood treatment notes do not reflect this. The last note from Dr. Davis reflected the claimant told him she did not feel she needed further treatment, medical marijuana did the job, and she had a normal mental status evaluation (23F/3-5).

PageID.38.

The ALJ may use evidence of "other" sources to show the severity of a claimant's impairments and how those impairments affect the claimant's ability to work. 20 C.F.R. § 404.1513(d). These "other" sources include non-medical sources such as spouses, parents and other caregivers, siblings, other relatives, friends, neighbors and clergy. 20 C.F.R. § 404.1513(d)(4). Perceptible weight must be given to lay testimony when "it is fully supported by the reports of the treating physicians." *Lashley v. Secretary of Health and Human Services*, 708

F.2d 1048, 1054 (6th Cir. 1983). *See also, Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) ("[t]he testimony of lay witnesses, however, is entitled to perceptible weight only if it is fully supported by the reports of the treating physicians") (citing *Lashley*). Here, the ALJ properly gave weight to Michael Salisbury's testimony to the extent it was supported by the reports of plaintiff's treating psychiatrist. Accordingly, plaintiff's claim of error should be denied.

### 4. Plaintiff's hospitalizations

Plaintiff contends that the ALJ ignored her hospitalizations. PageID.1013. Plaintiff is incorrect. The ALJ noted the voluntary hospitalizations as follows:

> Although the claimant had a rough patch starting February 2017 due to marital discord leading to March 2017 and May 2017 inpatient hospitalizations for suicidal ideation (21F and 27F), by August 2017, well within a year, she and her husband had reconciled, attended couple's therapy, and the claimant displayed full range of affect with normal mental status examination (23F/3-5).

PageID.37. Records reflect that plaintiff had two voluntary hospitalizations in the three years prior to the ALJ's decision: (1) admitted March 2, 2017 and discharged on March 8, 2017 (*see* PageID.776); and (2) admitted on May 20, 2017 and discharged on May 31, 2017 (*see* PageID.985). Plaintiff does not identify a third hospitalization.[3] The ALJ found that this exacerbation of plaintiff's condition in 2017 did not last the requisite 12-month period to qualify for a disability, having been resolved by August 2017. PageID.38. *See* 20 C.F.R. §404.1505 ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."). Accordingly, this claim of error should be denied.

---

[3] Defendant's brief addressed this discrepancy in footnote 5 as follows: "Plaintiff states she had three hospitalizations in three years. (PageID.1010, 1013). However, beginning in 2013, the ALJ and medical expert only found two hospitalizations in the records (PageID.37, 100), and Plaintiff's psychiatrist also only notated [sic] two hospitalizations (PageID.927, 934)." *See* PageID.1030.

### 5. Plaintiff cannot work

Plaintiff contends that her symptoms preclude her from performing any work. *See* PageID.1013-1014. Essentially, plaintiff is contesting the VE's testimony that she could perform a significant number of unskilled jobs at the light exertional level in the national economy. An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779. Here, the VE's testimony was in response to a hypothetical question which included the limitations set forth in the ALJ's RFC determination (PageID.103-104). Given this RFC, the VE determined that plaintiff had the ability to perform 171,800 unskilled jobs at the light exertional level in the national economy.[4] Accordingly, plaintiff's claim of error should be denied.

### IV. RECOMMENDATION

For the reasons discussed, I respectfully recommend that the Commissioner's decision be **AFFIRMED**.

Dated: November 25, 2019  /s/ Ray Kent
United States Magistrate Judge

---

[4] The Court notes a discrepancy between the ALJ's finding that plaintiff could perform 20,800 laundry sorter positions (PageID.41) and the VE's testimony that plaintiff could perform 20,200 laundry sorter positions (PageID.103-104). This minor error does not present a basis for a remand. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Even if the Court excluded the laundry sorter positions, plaintiff could still perform a significant number of jobs in the national economy as a mail clerk (98,200 positions) or a routing clerk (53,400 positions). PageID.41, 103-104.

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).